******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# RICARDO MACK *v.* COMMISSIONER OF CORRECTION
## (AC 46562)

Clark, Westbrook and Palmer, Js.

*Syllabus*

The petitioner, who had previously been convicted of, inter alia, murder, appealed, following the denial of his petition for certification to appeal from the habeas court's judgment denying his petition for a writ of habeas corpus. He claimed, inter alia, that the court improperly rejected his claim that his prior habeas counsel, M, had rendered ineffective assistance by failing to raise in his previous habeas action two claims of ineffective assistance against his criminal trial counsel, P. *Held*:

The habeas court abused its discretion in denying the petitioner's petition for certification to appeal, as his challenge to the court's resolution of the issue was not frivolous and warranted appellate review.

The habeas court properly rejected the petitioner's claim that M provided ineffective assistance by failing to raise claims in his prior habeas action that P had provided ineffective assistance by failing to object to certain evidence pertaining to the victim's autopsy in violation of his right to confrontation under the United States constitution, as the court properly determined that the petitioner failed to meet his burden of proving M provided ineffective assistance, the petitioner having failed to prove that P performed deficiently in failing to object to the admissibility of the autopsy report and certain testimony about the report.

The petitioner's claim that the habeas court improperly rejected his claim that M provided ineffective assistance by failing to raise claims in his prior habeas action that P had provided ineffective assistance by failing to advise him regarding the availability of sentence review and to pursue such review on his behalf lacked merit, as, even assuming that P rendered ineffective assistance by failing to represent the petitioner with respect to sentence review, the petitioner failed to demonstrate that M performed deficiently by not raising a claim of ineffective assistance against P predicated on P's failure to seek sentence review for the petitioner.

Argued September 4, 2025—officially released June 2, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the court, *Oliver, J.*, granted the respondent's motion to dismiss count one of the petition; thereafter, the case was tried to the court, *Newson, J.*; judgment denying the petition; subsequently, the court, *Newson,*

*J.*, denied the petition for certification to appeal, and the petitioner appealed to this court. *Affirmed.*

*Julia K. Conlin*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (petitioner).

*Nicholas Scarlett*, deputy assistant state's attorney, with whom, on the brief, were *Matthew Gedansky*, state's attorney, and *Angela Macchiarulo*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

PALMER, J. In this habeas on a habeas,[1] the petitioner, Ricardo Mack, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his second petition for a writ of habeas corpus challenging his 2008 conviction of one count of murder and two counts of assault in the first degree. On appeal, the petitioner claims that the habeas court (1) abused its discretion in denying his petition for certification to appeal and (2) improperly rejected his claim that his prior habeas counsel rendered ineffective assistance by failing to raise in his previous habeas action two claims of ineffective assistance against his criminal trial counsel, namely, trial counsel's failure to object to certain hearsay testimony concerning the autopsy of the murder victim and trial counsel's failure both to advise the petitioner of his right to sentence review and to seek such review on the petitioner's behalf. Although we agree with the petitioner that the habeas court abused its discretion in denying his petition for certification to appeal, we conclude that the habeas court properly determined that the petitioner failed to meet his burden of proving ineffective assistance of prior habeas counsel because the petitioner did not prove that his criminal

---

[1] As we discuss more fully hereinafter, "[a] habeas on a habeas occurs when a petitioner files a subsequent petition for a writ of habeas corpus challenging the effectiveness of counsel in litigating a previous petition for a writ of habeas corpus that had claimed ineffective assistance of counsel at the petitioner's underlying criminal trial or on direct appeal." *Haywood* v. *Commissioner of Correction*, 194 Conn. App. 757, 759 n.1, 222 A.3d 545 (2019), cert. denied, 335 Conn. 914, 229 A.3d 729 (2020).

trial counsel performed deficiently. Accordingly, we affirm the judgment of the habeas court denying the petitioner's habeas petition.

The following facts, as set forth by this court in the petitioner's direct appeal from his criminal conviction, and procedural history are relevant to the petitioner's claims on appeal. "A shooting resulting in the death of Chaz Booth and gunshot injuries to two other persons, Terrice Kimble and Christopher Henry, occurred in the early morning hours of December 24, 2005, in Hartford. Booth, Kimble, Henry and the [petitioner] were among a crowd of people in Papa's Pizza, which is a restaurant on Union Place in Hartford. Booth was sitting at a table near the front of the restaurant on the right side when, at approximately 2:42 a.m., the [petitioner] raised his arm and fired several gunshots from a handgun. The [petitioner] then moved forward, closer to Booth, and fired additional gunshots before running out the door.[2] Ten cartridge cases were recovered from the restaurant. Booth died from a total of seven gunshot wounds, with bullet trajectories indicating that the bullets entered him from the back.

"When the gunshots were fired, Kimble jumped on top of a table to make his way out of the restaurant. Once he was outside, he discovered that he had been shot and had suffered wounds to his arm and torso. Henry was sitting at the table opposite from where Booth was sitting. When the gunshots were fired, Henry dropped to the floor and hid under the table. He discovered that he had been shot in the leg, so he 'scooted' out of the restaurant without getting up from the floor.

"The [petitioner] fled the restaurant in a red Jeep Cherokee driven by another person. A Hartford police officer responded to a report of gunshots being fired at the restaurant and learned that a red Jeep Cherokee had

---

[2] "The restaurant had a security system, which recorded a silent video from four small cameras inside. Police seized the video, which showed the shooter and the shooting, but not the victim. The video was admitted as a full exhibit at trial, and portions of the recording were shown to the jury." *State* v. *Mack*, 129 Conn. App. 127, 129 n.3, 19 A.3d 689, cert. denied, 302 Conn. 908, 23 A.3d 1245 (2011).

left the scene. On his way to the restaurant, the officer came upon a motor vehicle accident involving a red Jeep Cherokee. When the officer approached, the [petitioner] fled from the vehicle on foot. The officer apprehended the [petitioner], arrested him and brought him to the police station. The police recovered the handgun used in the shooting from the vehicle.

"The [petitioner] made a statement to the police in which he confessed to the shooting.[3] He stated that he believed that Booth had shot and killed his friend Marlon Atkinson, also known as 'Pints,' in 2004. The [petitioner] shot Booth at the restaurant in retaliation for Atkinson's murder.

"At [the petitioner's criminal] trial, counsel for the [petitioner] argued that the [petitioner] had acted in self-defense. Two witnesses testified in support of this defense. Jaquan Leggett testified that the [petitioner] was in a heated conversation with someone at the restaurant just prior to the shooting, and that he saw a man consistent with Booth's description with a gun in his hand. Floyd Riley testified that, sometime before the shooting, the [petitioner] had told him that Booth had threatened him. The [petitioner] did not mention any of these facts in his signed confession. Both surviving victims of the shooting, Kimble and Henry, testified that they did not recall seeing Booth with a gun, nor did they recall hearing any argument between the [petitioner] and Booth.

"At trial, the state [also] presented evidence relating to the [petitioner's] consciousness of guilt. Specifically, it pointed to the [petitioner's] flight from the restaurant, the [petitioner's] flight from the red Jeep Cherokee following the collision and the arrival of the police, and the alleged effort of the [petitioner], in the form of certain notes [purportedly written by the petitioner] seized from

---

[3]"The court found that the [petitioner] had been advised properly of his rights and had knowingly, intelligently and voluntarily waived them." *State* v. *Mack*, 129 Conn. App. 127, 130 n.4, 19 A.3d 689, cert. denied, 302 Conn. 908, 23 A.3d 1245 (2011).

the cell of an inmate named Marcus Perry, to solicit testimony concerning his claim of self-defense." (Footnote altered; footnote in original.) *State* v. *Mack*, 129 Conn. App. 127, 129–30, 19 A.3d 689, cert. denied, 302 Conn. 908, 23 A.3d 1245 (2011).

Following a jury trial, the petitioner was convicted of one count of murder in violation of General Statutes § 53a-54a (a) and two counts of assault in the first degree with a firearm in violation of General Statutes § 53a-59 (a) (5). Id., 128. The trial court rendered judgment accordingly and imposed a total effective sentence of ninety years of incarceration. Id., 128 n.1. The petitioner directly appealed from that judgment of conviction, which this court affirmed.[4] Id., 141.

The petitioner commenced his first habeas action in 2011, alleging that his criminal trial counsel, Attorney Robert Pickering, rendered ineffective assistance by failing to conduct an adequate investigation into potential defense witnesses and failing to present the testimony of those witnesses at trial in support of the petitioner's claim of self-defense. Following a trial at which the petitioner was represented by Attorney Bruce McIntyre, the habeas court rejected those claims and denied the petition. See *Mack* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-12-4004389-S (August 22, 2014). From that judgment, the petitioner unsuccessfully appealed to this court. See *Mack* v. *Commissioner of Correction*, 165 Conn. App. 901, 137 A.3d 118, cert. denied, 321 Conn. 927, 138 A.3d 287 (2016).

The petitioner commenced a second habeas action in 2015, which underlies the present appeal. On February 23, 2022, the petitioner filed the operative amended petition for a writ of habeas corpus, which contains two

[4] In his direct appeal, the petitioner's sole claim involved the trial court's allegedly improper admission into evidence of the handwritten notes, apparently written by the petitioner and seized from Perry's cell, which, the state maintained, reflected an attempt by the petitioner to persuade Perry to testify falsely on the petitioner's behalf. *State* v. *Mack*, supra, 129 Conn. App. 128. This court rejected the petitioner's contention that the admission of the notes was improper. Id.

counts. In count one, the petitioner alleged ineffective assistance by Pickering for, inter alia, failing to object to certain testimony about the victim's autopsy by the then state's chief medical examiner, who had not personally conducted the autopsy, in violation of the petitioner's right to confrontation under the sixth amendment to the United States constitution.[5] In addition, the petitioner alleged that Pickering rendered ineffective assistance for failing to advise him regarding the availability of sentence review and for failing to pursue such review on his behalf. In count two, the petitioner alleged ineffective assistance on the part of McIntyre in his first habeas action due to his failure to raise the issues asserted in count one.

The respondent, the Commissioner of Correction, filed a motion to dismiss count one of the operative petition predicated on successive petition and abuse of writ grounds and, following a hearing, the court, on August 12, 2022, dismissed count one on those grounds.[6] With respect to count two, the respondent filed a return in which he either denied the substantive allegations of the petition or left the petitioner to his proof. At the habeas trial, which took place on February 23, 2023, the court heard testimony from the petitioner, McIntyre, and Pickering.

In its subsequent memorandum of decision dated April 4, 2023, the court concluded that the petitioner did not establish that McIntyre rendered ineffective assistance by not alleging in his first habeas action that Pickering rendered ineffective assistance by failing to raise a confrontation clause objection and by failing to advise the

---

[5] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI.

The sixth amendment right to confrontation is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Pointer* v. *Texas*, 380 U.S. 400, 403, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[6] On appeal, the petitioner does not challenge the habeas court's dismissal of count one.

petitioner regarding sentence review and failing to seek such review on the petitioner's behalf.[7] The court, therefore, denied the petition for a writ of habeas corpus. The petitioner then filed a petition for certification to appeal, which the habeas court denied, and this appeal followed.

I

First, we address the petitioner's claim that the habeas court improperly denied his petition for certification to appeal. We agree with the petitioner.

The following legal principles are applicable to our consideration of the petitioner's claim. "In *Simms* v. *Warden*, 229 Conn. 178, 187, 640 A.2d 601 (1994), [our Supreme Court] concluded that . . . [General Statutes] § 52-470 [g][8] prevents a reviewing court from hearing the merits of a habeas appeal following the denial of certification to appeal unless the petitioner establishes that the denial of certification constituted an abuse of discretion by the habeas court. In *Simms* v. *Warden*, 230 Conn. 608, 615–16, 646 A.2d 126 (1994), [our Supreme Court] incorporated the factors adopted by the United States Supreme Court in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), as the appropriate standard for determining whether the

[7]The court also rejected claims raised by the petitioner that McIntyre provided ineffective assistance by failing to plead and prove that Pickering did not: challenge the admissibility of the testimony of a handwriting expert presented by the state; adequately investigate and present a claim of self-defense; investigate and present the testimony of a certain potential witness identified by the petitioner; and consult with and present the testimony of an expert on gunshot wounds. On appeal, the petitioner does not contest the habeas court's determination that he failed to establish ineffective assistance with respect to these other grounds.

[8]General Statutes § 52-470 (g) provides: "No appeal from the judgment rendered in a habeas corpus proceeding brought by or on behalf of a person who has been convicted of a crime in order to obtain such person's release may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or, if such judge is unavailable, a judge of the Superior Court designated by the Chief Court Administrator, to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

habeas court abused its discretion in denying certification to appeal. This standard requires the petitioner to demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . A petitioner who establishes an abuse of discretion through one of the factors listed above must then demonstrate that the judgment of the habeas court should be reversed on its merits." (Emphasis in original; footnote added; internal quotation marks omitted.) *Ramos* v. *Commissioner of Correction*, 237 Conn. App. 372, 379–80, 352 A.3d 654 (2026).

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying [claim] to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive [claim] for the purpose of ascertaining whether [that claim satisfies] one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Brown* v. *Commissioner of Correction*, 230 Conn. App. 384, 392, 330 A.3d 134, cert. denied, 351 Conn. 921, 333 A.3d 103 (2025).

As our discussion in part II A of this opinion reflects, the issue of whether McIntyre rendered ineffective assistance in the first habeas action for failing to allege that Pickering performed deficiently by not raising a confrontation clause objection to the autopsy report and Carver's testimony about that report in accordance with *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), gives rise to the question of whether such a claim would have been novel or untested at the time of the petitioner's criminal trial. See, e.g., *Santaniello* v. *Commissioner of Correction*, 230 Conn. App. 741, 768–69, 331 A.3d 739 (counsel's failure to pursue novel

or untested constitutional argument does not constitute ineffective assistance), cert. denied, 351 Conn. 926, 333 A.3d 1109 (2025). Although we ultimately reject the petitioner's claim with respect to this issue, we agree with the petitioner that his challenge to the habeas court's resolution of the issue is not frivolous and warrants appellate review under the criteria set forth in *Simms* v. *Warden*, supra, 230 Conn. 615–16.[9] Accordingly, we conclude that the habeas court abused its discretion in denying the petition for certification to appeal.

## II

The petitioner contends that the court improperly rejected his claim that McIntyre provided ineffective assistance by failing to raise claims in his prior habeas action regarding Pickering's failure (1) to object to the admission of certain evidence pertaining to the victim's autopsy on the basis that it violated the petitioner's right to confrontation under the United States constitution pursuant to *Crawford* v. *Washington*, supra, 541 U.S. 36, because the associate medical examiner who conducted the autopsy did not testify at the petitioner's criminal trial and therefore was not subject to cross-examination and (2) to advise him regarding the availability of sentence review and to pursue such review on his behalf. We reject each of these claims.

We begin with an overview of the legal principles that govern our review of the petitioner's ineffective assistance of counsel claims. "In *Lozada* [v. *Warden*, 223 Conn. 834, 842–43, 613 A.2d 818 (1992)], our Supreme Court established that habeas corpus is an appropriate remedy for the ineffective assistance of appointed habeas counsel, authorizing what is commonly known as a habeas on a habeas, namely, a second petition for a writ of habeas corpus . . . challenging the performance

[9]In light of our conclusion that the petitioner is entitled to appellate review of the habeas court's denial of his habeas petition, we need not consider whether the habeas court improperly denied his petition for certification to appeal with respect to the other issues that we address herein.

of counsel in litigating an initial petition for a writ of habeas corpus . . . [that] had claimed ineffective assistance of counsel at the petitioner's underlying criminal trial or on direct appeal. . . . Nevertheless, the court in *Lozada* also emphasized that a petitioner asserting a habeas on a habeas faces the herculean task . . . of proving in accordance with *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. . . . Any new habeas trial would go to the heart of the underlying conviction to no lesser extent than if it were a challenge predicated on ineffective assistance of trial or appellate counsel. The second habeas petition is inextricably interwoven with the merits of the original judgment by challenging the very fabric of the conviction that led to the confinement." (Internal quotation marks omitted.) *Santaniello* v. *Commissioner of Correction*, supra, 230 Conn. App. 749.

"In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . In a habeas trial, the court is the trier of fact and, thus, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony . . . . It is simply not the role of this court on appeal to second-guess credibility determinations made by the habeas court. . . . [I]t is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, §8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . .

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [supra, 466

U.S. 687]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . .

"It is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland* test], whichever is easier. . . . [T]he petitioner's failure to prove either [the performance prong or the prejudice prong] is fatal to a habeas petition. . . . [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Citations omitted; internal quotation marks omitted.) *Mercer* v. *Commissioner of Correction*, 222 Conn. App. 713, 722–23, 306 A.3d 1073 (2023), cert. denied, 348 Conn. 953, 309 A.3d 303 (2024).

"In order for a petitioner to prevail on a claim of ineffective assistance on the basis of deficient performance, he must show that, considering all of the circumstances, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. . . . In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice . . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a

criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. . . . [J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . Indeed, our Supreme Court has recognized that [t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . .

"An evaluation of the prejudice prong involves a consideration of whether there is a reasonable probability that, absent the errors, the [fact finder] would have had a reasonable doubt respecting guilt. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . We do not conduct this inquiry in a vacuum, rather, we must consider the totality of the evidence before the judge or jury. . . . Further, we are required to undertake an objective review of the nature and strength of the state's case. . . . [S]ome errors will have had pervasive effect on the inferences to be drawn

from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . [A] court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . .

"In other words, [i]n assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable. . . . Notably, the petitioner must meet this burden not by use of speculation but by demonstrable realities." (Citation omitted; internal quotation marks omitted.) Id., 729–31.

In sum, "the ultimate focus of [the ineffectiveness] inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland* v. *Washington*, supra, 466 U.S. 696. Thus, "[t]the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id., 686. With these principles in mind, we turn to the petitioner's ineffective assistance claims.

### A

The petitioner first contends that the court improperly rejected his claim that McIntyre rendered ineffective assistance by failing to allege in the first habeas action that Pickering rendered ineffective assistance for not objecting to the admission of the victim's autopsy report, and testimony about that report, on the basis that it violated his right to confrontation under *Crawford*. We disagree.

The following additional facts and procedural history are relevant to the petitioner's claim. At the petitioner's criminal trial, the state called as a witness Harold Wayne Carver II, the state's chief medical examiner at that time. Carver testified that the victim's autopsy had been conducted by Malka Shah, an associate medical examiner who, at the time of Carver's testimony, was retiring from the Office of the Chief Medical Examiner, effective the following day. Although Carver did not perform the autopsy himself, he had reviewed the victim's autopsy photographs and the autopsy report prepared by Shah. Carver explained that the autopsy report was made and kept in the ordinary course of business of the Office of the Chief Medical Examiner. The autopsy report and the autopsy photographs were admitted into evidence as full exhibits during Carver's testimony, with no objection from Pickering.

In his testimony at the petitioner's criminal trial, Carver conveyed certain information contained in Shah's autopsy report while also providing his own independent opinions based on his review of the autopsy photographs. On direct examination, Carver testified, among other things, that Shah's report was consistent with his review of the autopsy photographs regarding the number of gunshot wounds that the victim had suffered. Carver explained that the victim was struck by seven projectiles and that he had a total of eleven gunshot wounds, including seven entrance wounds and four exit wounds.[10] Carver further explained that all of the entrance wounds were to the victim's back, and all of the gunshot wounds at the front of the victim's body were exit wounds. In addition, Carver provided testimony differentiating between the entrance and exit wounds based on the appearance of those wounds as depicted in the autopsy photographs.

During his cross-examination of Carver, Pickering highlighted the fact that Carver himself had not performed the autopsy and that he was "interpreting" Shah's report. Pickering also sought to cast doubt on Shah's conclusion that the gunshot wound to the victim's

---

[10]Carver also explained that six bullets had been recovered, three from the victim's clothing and three from the victim's body.

mouth was an exit wound by pointing out, through Carver, that she had reached that conclusion by a "process of elimination."[11] On redirect examination, Carver explained that he agreed with Shah's conclusions regarding the entrance and exit wounds based on his independent review of the photographs.[12]

At the habeas trial, Pickering testified that he could not recall whether he had objected to the admission of the autopsy report and he also could not say whether he was aware of *Crawford* at the time of the petitioner's criminal trial. He assumed, however, that the autopsy report was admissible as a business record and, on that basis, he would not have objected to it. In addition, he testified that, if the report "was coming in anyway," he was "not going to highlight it." McIntyre testified that he did not see an issue with Carver's testimony in light of the fact that Carver was the state's chief medical examiner at that time and, testifying as an expert in the field of pathology, he properly could rely on hearsay in reaching his opinion. As a result, McIntyre did not view Pickering's failure to object to such testimony as an unreasonable exercise of professional judgment.

In its memorandum of decision, the habeas court rejected the petitioner's ineffective assistance claim, concluding that McIntyre did not perform deficiently in failing to allege that Pickering's failure to object to the admissibility of the autopsy report and Carver's related testimony because, under *Crawford* and *Davis* v. *Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)—the controlling United States Supreme Court precedent at the time of the petitioner's criminal trial—the autopsy report was admissible as a business record. The habeas court further observed that,

---

[11]Carver explained that Shah had recorded a "wound track" associated with that gunshot wound, tracing the pathway of the bullet from the wound demarking its apparent point of entry at the back of the victim's body to the exit wound. Carver testified that he agreed with Shah's conclusion.

[12]We discuss Carver's testimony regarding the autopsy photographs more fully later in this opinion.

"although [Carver] necessarily referred to the findings made by . . . Shah, he offered his own independent explanation as to what those findings meant and also added additional expert information explaining the meaning of the photographs depicting the injuries suffered by the victim." Accordingly, the habeas court rejected the petitioner's claims of ineffective assistance by Pickering and McIntyre with respect to Pickering's failure to object to the admissibility of the autopsy report and Carver's testimony about the report.

Before turning to the merits of the petitioner's ineffective assistance claim, we first undertake a brief review of *Crawford* and its progeny to place the petitioner's claim in proper context. "Prior to *Crawford*, the United States Supreme Court had not distinguished between testimonial and nontestimonial statements for purposes of determining when the admission of hearsay statements of unavailable witnesses in criminal cases violated the confrontation clause of the sixth amendment. See *Crawford* v. *Washington*, supra, 541 U.S. 71–72 (Rehnquist, C. J., concurring in the judgment). Rather, under the previous test forth set in *Ohio* v. *Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled in part by *Crawford* v. *Washington*, [supra, 541 U.S. 36] all such statements were admissible if they had 'adequate indicia of reliability . . . [which] can be inferred . . . where the evidence falls within a firmly rooted hearsay exception . . . [or pursuant to] a showing of particularized guarantees of trustworthiness.' . . . Id., 66. . . . To satisfy the constitutional demand of confrontation prescribed by the sixth amendment, the court [in *Crawford*] reformulated the test to distinguish between testimonial and nontestimonial statements, holding that testimonial evidence is not admissible under the sixth amendment, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." (Citation omitted.) *Santaniello* v. *Commissioner of Correction*, supra, 230 Conn. App. 763–64.

The issue in *Crawford* was whether a tape-recorded statement that the defendant's wife had given to the police was properly admitted into evidence even though she was unavailable to testify at trial due to the marital privilege. *Crawford* v. *Washington*, supra, 541 U.S. 40. The court in *Crawford* held that, regardless of its "indicia of reliability"; id., 42; the tape recording was barred under the confrontation clause because the statement, like other such statements obtained pursuant to police interrogation, was testimonial and therefore inadmissible without the opportunity for cross-examination. Id., 68–69. As to other types of statements, however, the court declined "to spell out a comprehensive definition of 'testimonial.'" Id., 68. Nevertheless, the court broadly explained that "[v]arious formulations of this core class of testimonial statements exist: [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . Regardless of the precise articulation, some statements qualify under any definition . . . ." (Citations omitted; internal quotation marks omitted.) Id., 51–52.

Soon thereafter, in *Davis* v. *Washington*, supra, 547 U.S. 813, the United States Supreme Court expounded on the third category of statements in determining, inter alia, the admissibility of hearsay statements made to a 911 operator. Id., 817–19, 823–28. In distinguishing between testimonial and nontestimonial statements made to the police, the court applied a "primary purpose" test with respect to such statements, explaining as follows: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively

indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id., 822.

The United States Supreme Court subsequently applied its holding in *Crawford* to forensic tests and reports, concluding, in *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), that certificates attesting to the laboratory analysis of suspected cocaine "[fell] within the core class of testimonial statements" and, consequently, were inadmissible without an opportunity for cross-examination. (Internal quotation marks omitted.) Id., 310. In *Bullcoming* v. *New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), the court reaffirmed its holding in *Melendez-Diaz*, concluding that a laboratory report certifying the defendant's blood-alcohol level was a testimonial statement under *Crawford*, and, as such, its admission at trial through a witness who did not perform the blood alcohol test violated the defendant's right to confrontation. Id., 657, 661–62. The United States Supreme Court has subsequently decided several confrontation clause cases concerning a state's use of forensic evidence,[13] but it has never opined expressly as to whether autopsy reports are testimonial hearsay subject to the protection of the confrontation clause.

[13]See, e.g., *Smith* v. *Arizona*, 602 U.S. 779, 802–803, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024) ("A [s]tate may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her. . . . Neither may the [s]tate introduce those statements through a surrogate analyst who did not participate in their creation. . . . And nothing changes if the surrogate . . . presents the out-of-court statements as the basis for his expert opinion." (Citations omitted.)); *Williams* v. *Illinois*, 567 U.S. 50, 79, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (plurality opinion) (confrontation clause does not bar expert from relying on and describing nontestifying analyst's DNA profile where profile is not admitted for its truth and is not testimonial).

In the present appeal, the petitioner contends that Shah's statements, admitted through the autopsy report and Carver's testimony about the report's findings, were testimonial in nature under *Crawford* and ensuing precedent, and, because Shah was not subject to cross-examination, the admission of the report and Carver's testimony violated his right to confrontation. Because Pickering failed to object to the admission of that evidence on the basis of *Crawford*, the petitioner contends that McIntyre should have raised an ineffective assistance claim against Pickering on that ground in the first habeas action.

In response, the respondent maintains that Pickering's failure to raise a *Crawford* objection did not constitute deficient performance because, inter alia, it would have required a novel legal argument. Specifically, the respondent argues that, although the opinion in *Crawford* was issued in 2004, four years before the petitioner's criminal trial, there was little or no indication at any time before the trial that *Crawford* applied to autopsy reports. The respondent further contends that there is "a lack of clarity even today as to how *Crawford* would apply to Carver's expert opinion interpreting Shah's report" because the United States Supreme Court has never addressed the precise question, and our Supreme Court has declined to resolve the issue in several recent cases.[14] Given the state of the law at the time of the petitioner's trial, we agree with the respondent that Pickering's failure to raise a confrontation clause objection to the admissibility of the autopsy report and Carver's testimony concerning the report did not constitute ineffective assistance.

"[C]ounsel's failure to advance novel legal theories or arguments does not constitute ineffective performance. . . . To conclude that counsel is obligated to recognize and to preserve previously undecided constitutional claims, the viability of which is purely speculative, would be to

[14]See *State* v. *Villanueva*, 352 Conn. 439, 475 and n.17, 337 A.3d 734 (2025); *State* v. *Robles*, 348 Conn. 1, 9 and n.5, 301 A.3d 498 (2023); *State* v. *Campbell*, 328 Conn. 444, 511, 180 A.3d 882 (2018).

require criminal defense lawyers to possess a measure of clairvoyance that the sixth amendment surely does not demand. . . . Thus, the failure of counsel to pursue a novel constitutional argument does not constitute ineffective assistance." (Internal quotation marks omitted.) *Santaniello* v. *Commissioner of Correction*, supra, 230 Conn. App. 768–69. "Counsel . . . performs effectively when he elects to maneuver within the existing law, declining to present untested . . . legal theories." (Internal quotation marks omitted.) *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 462, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006).

As the respondent points out, it was not until the decision in *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 305, which was not issued until the year *after* the petitioner's criminal trial, that the United States Supreme Court clarified that scientific evidence in the form of forensic tests and reports—as distinguished from the eyewitness statements to the police at issue in *Crawford* and *Davis*—is subject to the protections of the confrontation clause. Id., 311. Although Justice Scalia, writing for the majority in *Melendez-Diaz*, characterized the case as "involv[ing] little more than the application of our holding in *Crawford*"; id., 329; prior to the *Melendez-Diaz* decision, such forensic evidence was routinely regarded as admissible at trial without testimony from the analyst or examiner who conducted the scientific analysis. Indeed, in his dissenting opinion in *Melendez-Diaz*, Justice Kennedy made this very point, explaining that, "[u]ntil today, scientific analysis could be introduced into evidence without testimony from the 'analyst' who produced it. This rule has been established for at least [ninety] years . . . [y]et the court undoes it based on two recent opinions [that is, *Crawford* and *Davis*] that say nothing about forensic analysts . . . ."[15] Id., 330 (Kennedy, J., dissenting).

[15]Chief Justice Roberts and Justices Breyer and Alito joined Justice Kennedy's dissenting opinion in *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 305.

Justice Kennedy further explained that "*Crawford* and *Davis* dealt with ordinary witnesses"; id.; who, unlike forensic experts, had "witness[ed] (that is, perceive[d]) an event that gives him or her personal knowledge of some aspect of the defendant's guilt"; id., 343–44; and whose testimony, therefore, "may not be admitted without the witness appearing at trial to meet the accused face to face." Id., 330. According to Justice Kennedy, however, "nothing in the [c]onfrontation [c]lause's text, history, or precedent justifies the [c]ourt's decision to expand [*Crawford* and *Davis*]"; id., 344; to include "[l]aboratory analysts who conduct routine scientific tests" because they "are not the kind of conventional witnesses to whom the [c]onfrontation [c]lause refers." Id., 357 (Kennedy, J., dissenting). Although Justice Kennedy's view concerning the applicability of *Crawford* to forensic reports and testimony did not carry the day, his point regarding the dearth of precedent prior to *Melendez-Diaz* treating forensic evidence as within the purview of the confrontation clause supports the respondent's assertion that Pickering's failure, prior to *Melendez-Diaz*, to object to the autopsy report and Carver's hearsay testimony did not constitute deficient performance.

Consistent with the distinction recognized by Justice Kennedy in his dissent in *Melendez-Diaz* between conventional witnesses and forensic analysts, the great weight of post-*Crawford* authority prior to *Melendez-Diaz* had concluded that autopsy reports were not testimonial within the meaning of *Crawford*. See, e.g., *United States* v. *De La Cruz*, 514 F.3d 121, 133 (1st Cir. 2008), cert. denied, 557 U.S. 934, 129 S. Ct. 2858, 174 L. Ed. 2d 600 (2009); *United States* v. *Feliz*, 467 F.3d 227, 233–34 (2d Cir. 2006), cert. denied sub nom. *Erbo* v. *United States*, 549 U.S. 1238, 127 S. Ct. 1323, 167 L. Ed. 2d 132 (2007); *Sharifi* v. *State*, 993 So. 2d 907, 931–32 (Ala. Crim. App. 2008); *State* v. *Lackey*, 280 Kan. 190, 202, 120 P.3d 332 (2005), overruled on other grounds by *State* v. *Davis*, 283 Kan. 569, 158 P.3d 317 (2006); *State* v. *Edwards*, 173 N.C. App. 757, 620 S.E.2d 320 (2005); *State* v. *Craig*, 110 Ohio St. 3d 306,

322, 853 N.E.2d 621 (2006); *Moreno Denoso* v. *State*, 156 S.W.3d 166, 180–81 (Tex. App. 2005); see also C. Zabrycki, comment, "Toward a Definition of 'Testimonial': How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement," 96 Cal. L. Rev. 1093, 1100 (2008) (explaining that "[a]n extensive survey of the [post-*Crawford*] case law indicates that every court of last resort or intermediate court has held that autopsy reports are not testimonial"). Indeed, the petitioner has identified no case, and we are aware of none, in which an appellate court—state or federal—had decided, prior to the petitioner's criminal trial, that autopsy reports were testimonial and, therefore, subject to the protection of the confrontation clause.[16]

Among the courts that addressed the issue post-*Crawford* but before *Melendez-Diaz*, the most significant for present purposes is *United States* v. *Feliz*, supra, 467 F.3d 233–34, in which the United States Court of Appeals for the Second Circuit, in 2006, considered whether autopsy reports qualify as business records and, if so, whether their classification as such renders them nontestimonial under *Crawford*. Id., 233–37. In considering the issue, the court in *Feliz* observed that *Crawford* itself had characterized business records as nontestimonial;[17] id., 233; and, further, that Chief Justice Rehnquist, in his concurring opinion in *Crawford*, "praised what he considered to be *Crawford*'s per se exclusion of business records from the definition of testimonial."[18] Id., 236.

---

[16]We note that at least one case decided after *Crawford* but prior to *Melendez-Diaz*, namely, *State* v. *Johnson*, 756 N.W.2d 883 (Minn. App. 2008), held that the admission of an autopsy report through the testimony of a medical examiner who did not perform the autopsy violated the defendant's right to confrontation. Id., 887, 891–92. The opinion in *Johnson*, however, was not issued until more than six months after the conclusion of the petitioner's criminal trial and, consequently, it was not available to Pickering when the petitioner's case was tried.

[17]See *Crawford* v. *Washington*, supra, 541 U.S. 55–56 (explaining that, historically, there were always exceptions to general rule excluding hearsay statements, and "[m]ost" of those exceptions "covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy").

[18]See *Crawford* v. *Washington*, supra, 541 U.S. 76 (Rehnquist, C. J., concurring) ("[t]o its credit, the [c]ourt's analysis of 'testimony'

Following a comprehensive analysis of the issue, the court in *Feliz* held, first, that the autopsy reports qualified as business records, and second, that such "reports are not testimonial within the meaning of *Crawford* and, thus, do not come within the ambit of the [c]onfrontation [c]lause . . . ."[19] Id., 229. Although decisions of the Second Circuit are not binding on our courts, they are "particularly persuasive" in resolving issues of federal law. (Internal quotation marks omitted.) *State* v. *Langston*, 346 Conn. 605, 618–19, 294 A.3d 1002 (2023), cert. denied,      U.S.      , 144 S. Ct. 698, 217 L. Ed. 2d 391 (2024). Accordingly, in the absence of any controlling or compelling contrary authority—indeed, in the absence of *any* contrary precedent—*Feliz* provided a sound basis for Pickering's decision not to object to the autopsy report or Carver's testimony in reliance on the report.

Notably, not long *after Melendez-Diaz* and *Bullcoming* v. *New Mexico*, supra, 564 U.S. 647, were decided, the Second Circuit Court of Appeals reconsidered its reasoning in *Feliz* and concluded, in *United States* v. *James*, 712 F.3d 79 (2d Cir. 2013), cert. denied, 572 U.S. 1134, 134 S. Ct. 2660, 189 L. Ed. 2d 208 (2014), that determining whether an autopsy report is testimonial depends not on whether the report properly may be

excludes at least some hearsay exceptions, such as business records and official records").

[19]The court in *Feliz* further explained: "[W]here a statement is properly determined to be a business record . . . it is not testimonial within the meaning of *Crawford*, even where the declarant is aware that it may be available for later use at trial." (Citation omitted.) *United States* v. *Feliz*, supra, 467 F.3d 236. Such a statement "cannot be testimonial because a business record is fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence. . . . [T]he essence of the business record exception contemplated in *Crawford* is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are by their nature not prepared for litigation." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 233–34.

We further note that the court in *Feliz* also concluded that the autopsy reports qualified as nontestimonial public records and, for that reason, as well, the reports were deemed to fall outside the purview of the confrontation clause. Id., 237.

classified as a business record, as the court in *Feliz* had decided, but, rather, whether "the autopsy report . . . was prepared with the primary purpose of creating a record for use at a later criminal trial." Id., 97. Concluding that the autopsy was " 'routine' "; id., 98; the cause of death was " 'undetermined' "; id., 99; no one involved in the autopsy process suspected either that the victim had been murdered or that the medical examiner's report would be used at a criminal trial, and the autopsy was performed "substantially before any criminal investigation into [the victim's] death had begun," the court in *James* held that the autopsy was not testimonial and, therefore, its admission into evidence did not violate the confrontation clause. Id.

More recently, in *Garlick* v. *Lee*, 1 F.4th 122 (2d Cir. 2021), cert. denied,    U.S.    , 142 S. Ct. 1189, 212 L. Ed. 2d 54 (2022), the Second Circuit Court of Appeals concluded that the autopsy report at issue was testimonial because, among other considerations, it was "performed in aid of an active police investigation . . . [p]reparations for the autopsy commenced at [the] request [of the police] . . . [t]he autopsy was performed in the presence of . . . two detectives . . . [and] [a]fter completing the autopsy, [the medical examiner who performed the autopsy] promptly notified law enforcement of her findings, and the police consequently dropped charges against [the suspect initially charged with the victim's murder] and pursued a murder charge against [the defendant]." Id., 134. In view of these facts, the court concluded that "[t]he circumstances under which the autopsy report was created would lead any objective witness to believe that the [report] would be available for use at a later trial."[20] (Internal quotation marks omitted.)

---

[20]It bears mention that the United States Supreme Court has not always been entirely consistent with respect to the terminology it has used to describe the test for determining whether a hearsay statement is testimonial. Recently, in *Smith* v. *Arizona*, 602 U.S. 779, 144 S. Ct. 1785, 219 L. Ed 2d 420 (2024), the court recognized that it has characterized that test somewhat differently from time to time, observing that testimonial hearsay represents a "category whose contours we have variously described"; id., 784; and offering the following examples: "statements 'made in the course of police interrogation' were testimonial when 'the primary purpose of the interrogation [was] to establish

Id. Thus, the Second Circuit Court of Appeals' treatment of autopsy reports for confrontation clause purposes changed markedly after *Melendez-Diaz* was decided.[21]

Instead of acknowledging that *Feliz*, *James* and *Garlick* reflect the extent to which *Melendez-Diaz* upended widely held assumptions about the admissibility of forensic evidence by holding that the state's use of such evidence is subject to the requirements of the confrontation clause, the petitioner maintains that Pickering should have anticipated the holding in *Melendez-Diaz* because it is based, ultimately, on the reasoning of *Crawford*, which was decided four years before the petitioner's criminal trial. The petitioner further maintains that Pickering should have objected to Carver's testimony about the autopsy report because that testimony—which cast serious doubt on the petitioner's claim of self-defense by

or prove past events potentially relevant to later criminal prosecution'; [*Davis* v. *Washington*, supra, 547 U.S. 822] . . . statements made to police to 'meet an ongoing emergency' were 'not procured with a primary purpose of creating an out-of-court substitute for trial testimony'; [*Michigan* v. *Bryant*, 562 U.S. 344, 358, 359, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)]; [and] . . . testimonial certificates of the results of forensic analysis were created 'under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial . . . .' [*Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 311] . . . ." *Smith* v. *Arizona*, supra, 784–85; see also id., 802 (to "count as testimonial . . . the . . . primary purpose [of the documents at issue] must have a focus on court" (internal quotation marks omitted)). These differences, however, have no bearing on our analysis in the present case because the issues we must decide are unrelated to the precise way in which the United States Supreme Court has characterized the test for ascertaining whether a statement is testimonial.

[21]Soon after *Melendez-Diaz* was decided, a considerable number of courts across jurisdictions adopted the same methodology for resolving confrontation clause challenges to the admissibility of autopsy reports that the court in *Melendez-Diaz* had announced for forensic laboratory reports more generally. See, e.g., *United States* v. *Ignasiak*, 667 F.3d 1217, 1231 (11th Cir. 2012); *United States* v. *Moore*, 651 F.3d 30, 72–73 (D.C. Cir. 2011), aff'd sub nom. *Smith* v. *United States*, 568 U.S. 106, 133 S. Ct. 714, 184 L. Ed. 2d 570 (2013); *Commonwealth* v. *Avila*, 454 Mass. 744, 762–63, 912 N.E.2d 1014 (2009); *State* v. *Locklear*, 363 N.C. 438, 452, 681 S.E.2d 293 (2009); *Cuesta-Rodriguez* v. *State*, 241 P.3d 214, 226–28 (Okla. Crim. App. 2010), cert. denied, 565 U.S. 885, 132 S. Ct. 259, 181 L. Ed. 2d 151 (2011); *Wood* v. *State*, 299 S.W.3d 200, 208–10 (Tex. App. 2009).

establishing that the victim had been shot exclusively and repeatedly in the back—would have been inadmissible under the methodology first employed in *Crawford* for traditional witness testimony. In support of his contention concerning the inadmissibility of Carver's testimony, the petitioner identifies several factors that, he claims, establish that the primary purpose of the autopsy was to aid the state in proving that the petitioner had murdered the victim, namely, the autopsy was performed to establish the cause and manner of the victim's death, there was a suspect in custody, there was no ongoing emergency, and bullets recovered from the victim's body had been turned over to the police.

The petitioner may well be correct that, under *Melendez-Diaz* and subsequent United States Supreme Court precedent, the autopsy report and Carver's testimony about the report would constitute testimonial and, therefore, excludable, hearsay, even though neither the United States Supreme Court nor our Supreme Court has expressly addressed the applicability of *Melendez-Diaz* to autopsy reports. Even assuming that to be the case, however, it is beside the point for present purposes because we must decide only whether Pickering was professionally obligated to raise an objection to Carver's testimony at the petitioner's criminal trial in 2008, and not whether it would be necessary for him to do so today, eighteen years later. See, e.g., *Santaniello* v. *Commissioner of Correction*, supra, 230 Conn. App. 768–69 (counsel's performance must be evaluated in context of law in existence at time of criminal trial). As we have discussed, prior to *Melendez-Diaz*, courts had not applied the then recent holdings in *Crawford* and *Davis* to forensic reports generally or to autopsy reports specifically and, consequently, we cannot conclude that Pickering was required to break new ground by objecting to Carver's forensic testimony on confrontation clause grounds.[22] Accordingly, in light of the law as it existed

[22]Although autopsy reports were invariably viewed as nontestimonial at the time of the petitioner's criminal trial, such that their admission was not barred by *Crawford*, courts have observed that it was unclear even after *Melendez-Diaz* and *Bullcoming* whether the admissibility of autopsy reports was subject to the restrictions of the confrontation

when the petitioner's criminal trial took place, we reject the petitioner's contention that Pickering performed deficiently in failing to object to the autopsy report and Carver's testimony on the basis of *Crawford*. As a necessary consequence of this conclusion, we also reject the petitioner's contention that McIntyre rendered ineffective assistance in not raising a claim that Pickering was deficient in not seeking to exclude the autopsy report and Carver's related testimony.[23]

We further conclude that, even if Pickering's failure to raise a confrontation clause objection to the admissibility of the autopsy report and Carver's corresponding testimony about the report constituted deficient performance, the petitioner has failed to satisfy the prejudice prong of *Strickland*. The petitioner contends that "[t]he autopsy evidence constituted the only evidence in the case supporting the notion that all of the shots were to the victim's back," which "severely undermined" the petitioner's claim of self-defense at his criminal trial. The petitioner further maintains that, but for McIntyre's

clause. See, e.g., *Vega* v. *Walsh*, 669 F.3d 123, 128 n.2 (2d Cir. 2012) ("a fair issue exists as to whether [classifying autopsy reports as nontestimonial] would have been contrary to or an unreasonable application of *Melendez-Diaz* or *Bullcoming*, even assuming they had already been decided [at the time of the defendant's trial], as there are significant differences between narcotics and blood alcohol analyses and autopsies"); *Nardi* v. *Pepe*, 662 F.3d 107, 112 (1st Cir. 2011) ("That close decisions in the later [United States] Supreme Court cases extended *Crawford* to new situations hardly shows the outcomes were clearly preordained. And, even now it is uncertain whether, under its primary purpose test, the [United States] Supreme Court would classify autopsy reports as testimonial. . . . In all events, we stress the present [post-*Melendez-Diaz* and *Bullcoming*] uncertainty of the law [more than seven years post-*Crawford*] only to emphasize that it was even more unsettled at the time of *Crawford* just how far that decision would be extended beyond statements taken by the police for specific use at trial." (Citations omitted.)).

[23]In view of our determination that Pickering's failure to object to Carver's testimony about the autopsy report did not constitute ineffective assistance, we need not address the reasonableness of Pickering's strategic decision not to object to that testimony so as not to draw the jury's attention to it; see, e.g., *Revels* v. *Commissioner of Correction*, 229 Conn. App. 461, 478, 327 A.3d 418 (2024) (counsel may, for strategic reasons, decide not to focus jury's attention on certain evidence), cert. denied, 351 Conn. 906, 330 A.3d 133 (2025); notwithstanding Pickering's own testimony in the present case that he could not recall whether he was aware of *Crawford* at the time of the petitioner's trial.

failure to raise a claim that Pickering was ineffective for not challenging the evidence pertaining to Shah's findings and conclusions, there is a reasonable probability that the result of the proceedings would have been different. We disagree.

As previously noted, at the petitioner's criminal trial, Pickering's defense strategy included a claim of self-defense. In support of the claim, Pickering adduced testimony from two witnesses, Leggett and Riley. Leggett was at Papa's Pizza on the night of the shooting and claimed to have seen the victim—who, Leggett asserted, had a gun—about to shoot the petitioner first. Riley was not at Papa's Pizza that night but testified that he overheard a phone conversation between the victim and the petitioner more than one month before the shooting, during which the victim told the petitioner that he was "a hard person to hit and that he wasn't going to miss him next time." Riley testified that, one or two days prior to the phone call, he saw shattered glass falling from the petitioner's car, and the petitioner stated that someone had shot at him. In closing argument, Pickering underscored Leggett's and Riley's testimony in support of the petitioner's self-defense claim, as well as the fact that, because the victim was not visible in the video footage of the shooting, the video did not directly contradict the petitioner's version of the shooting.[24]

The petitioner is correct that the state, in disproving his claim of self-defense,[25] relied, in part, on the evidence that all the shots fired by the petitioner had entered the victim's back and that such evidence provided a strong rebuttal to the petitioner's claim that he shot the victim

---

[24]See footnote 2 of this opinion.

[25]"[A] defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt." (Internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 837, 234 A.3d 78 (2020), aff'd, 341 Conn. 279, 267 A.3d 120 (2021).

only because the victim had pulled a gun on him first. Contrary to the petitioner's argument, however, the autopsy report and Carver's testimony about the report was not the only evidence establishing that all seven of the petitioner's shots struck the victim in the back. Carver also provided detailed testimony, based on his independent examination of the autopsy photographs, that the gunshot wounds to the victim's back were entrance wounds and the gunshot wounds at the front of the victim's body were exit wounds.

More particularly, on redirect examination, Carver explained that the autopsy photograph of the petitioner's back revealed that "there are . . . seven holes, and these all have the characteristic appearance of an entrance wound. . . . When a bullet goes in it scrapes away the outer layer of skin. These have not totally dried so that there's this pink area where . . . the pigment in your skin is in that outer layer. Everything's pink after about a half of a millimeter inside. And these are round. A round bullet goes in your skin at ninety degrees; it makes a circle. If it goes in at an angle, it makes an oval. But these are a typical appearance of a place where a bullet went into a body."

Carver also explained that the gunshot wounds to the front of the victim's body, specifically, to his upper left chest, his left arm, and the left side of his mouth, were exit wounds. With respect to the wounds to the victim's upper left chest and left arm, Carver testified, with reference to the autopsy photographs, that "the one on the arm, and I've examined this up close . . . there's no dark marks around the edge. So, this bullet did not touch the outer layer of skin coming out. So, that's what an exit wound looks like. The other two are very similar in appearance. They have a little darkness around them, but not all the way around. This one, no darkness here, no darkness here. This one, a little bit over here. So, these are exit wounds. . . . [T]hese definitely have the appearance of places where bullets came out of a body as opposed to where bullets went in."

Shortly thereafter, Carver made it perfectly clear that

he was not simply reciting Shah's conclusions regarding the gunshot wounds but, rather, that he had also reached his own independent conclusions, separate and apart from the autopsy report, based on his review of the autopsy photographs. After Carver answered a question by reference to what Shah had stated in the autopsy report, the prosecutor clarified: "But based on your background, your training, your experience, your review of the photographs, all seven entrance wounds were in the back and those three in the chest area and arm were exit wounds[?]" Carver responded: "Yes." Thereafter, the following colloquy took place between the prosecutor and Carver:

"[The Prosecutor]: Pickering made it a point of fact that you did not hands-on perform the autopsy.[26] But with respect to gunshot wounds, you're able to tell a lot from the photos. Aren't you?

"[Carver]: Oh, yes.

"[The Prosecutor]: In fact, independent of what . . . Shah says, is it your conclusion, based on your background, training, experience and the photographs you saw that those seven holes in [the victim's] back are all entrance wounds?

"[Carver]: Yes. . . . If I were to analyze this from the photographs, absent her written report, I would reach the same conclusions.

"[The Prosecutor]: And with respect to the exit wound in the mouth, as well as the left chest and arm?

"[Carver]: Yes.

"[The Prosecutor]: That those are exit wounds?

"[Carver]: Yes." (Footnote added.)

---

[26]On cross-examination, Pickering attempted to cast doubt on Carver's conclusions by emphasizing that Carver had not performed the autopsy himself. In doing so, Pickering stated to Carver, "[y]ou're really just interpreting the report at this point in time," to which Carver responded: "Absolutely. I frequently poke my nose into a gunshot wound autopsy, but I don't remember having poked my nose into this one."

It is apparent that this portion of Carver's testimony detailing his conclusions about the entry and exit wounds sustained by the victim—testimony that was based solely on his examination of the autopsy photographs and not on the autopsy report—provided a wholly independent basis for the jury to conclude that all the shots fired by the petitioner were to the victim's back.[27]

Our Supreme Court reached the same conclusion on materially similar facts in *State* v. *Robles*, 348 Conn. 1, 9, 301 A.3d 498 (2023), a case in which the defendant claimed that his right to confrontation was violated by the testimony of James Gill, the chief medical examiner at the time, concerning an autopsy that Gill did not personally perform but was instead conducted by a former assistant medical examiner. Id., 5, 8. Gill testified about the former assistant medical examiner's autopsy report, which the defendant claimed was testimonial because it had been performed in anticipation of trial, and also offered his own opinion, predicated on his examination of several photographs from the autopsy, that the victim had been shot and killed at a range of approximately six inches. Id., 8–11. Our Supreme Court held that Gill's testimony expressing his opinion that the victim had been shot at close range was based solely on his examination of the autopsy photographs, and not from the autopsy report, and that, because defense counsel had the opportunity to cross-examine Gill about his testimony with respect to the photographs, that testimony did not violate the confrontation clause. Id., 11. Finally, our Supreme Court in *Robles* further determined that, even if Gill's testimony about the autopsy report had been improperly admitted, his testimony based solely on the autopsy photographs constituted "admissible,

---

[27]The petitioner does not claim that Pickering should have objected either to the admission of the autopsy photographs or to Carver's testimony setting forth his independent opinion based on his review of those photographs. See, e.g., *State* v. *Lebrick*, 334 Conn. 492, 528, 223 A.3d 333 (2020) ("[when] . . . expert witnesses present their own independent judgments, rather than merely transmitting testimonial hearsay, and are then subject to cross-examination, there is no [c]onfrontation [c]lause violation" (internal quotation marks omitted)).

independent and compelling evidence"; id., 12; that the victim had been shot at close range. Id., 14. As in *Robles*, Carver's admissible and independent testimony, based on the autopsy photographs, concerning the entry and exit wounds suffered by the victim, was compelling evidence, separate and apart from the autopsy report, in support of the state's theory of the case, namely, that the petitioner intentionally shot and killed the victim and was not acting in self-defense when he did so.[28]

Moreover, the petitioner's claim of self-defense was substantially discredited by other evidence presented at trial. Most significantly, the state introduced evidence that the petitioner, having been advised of his rights, confessed to the police that he shot the victim in retaliation for the murder of his friend. Detective Michael Sheldon of the Hartford Police Department testified that he conducted an interview of the petitioner shortly after the crime occurred. Sheldon testified: "I asked [the petitioner] why this happened. And he told me that his friend Marlon Atkinson was murdered in Hartford back in July of 2004. He said that him and Marlon had shared a lot of good memories together. . . . He said that [Atkinson] had murdered a guy by the name of Kevin Johnson. . . . Kevin Johnson was an associate of Chaz Booth from what I understand." When asked by the prosecutor: "Did [the petitioner] indicate why he killed Chaz Booth?" Sheldon responded: "He said this was retaliation for what he did to Marlon Atkinson. . . . He said when he entered Papa's [Pizza] he saw Chaz Booth inside. He said he had started thinking about what he

---

[28]As the petitioner correctly points out in attempting to distinguish the present case from *Robles*, in contrast to the present case, the autopsy report in *Robles* was not admitted into evidence. See *State* v. *Robles*, supra, 348 Conn. 10. We are not persuaded that this distinction makes a difference, however, in view of Carver's explicit and compelling testimony expressing his opinion, based solely on the photographs, regarding the exit and entry wounds. In addition, the jury in *Robles* was well aware of the content of the autopsy report, even though it had not been introduced into evidence, because a portion of Gill's testimony was devoted expressly to the findings and conclusions of the autopsy report. See id., 9–10.

had done to Marlon and said he knew he had to pay for what he did. He said he had a .45 caliber Glock on him, dark in color, and he started shooting at Chaz. He said he knew Chaz went down and he kept firing at him." The petitioner's confession was memorialized in a written statement, which the petitioner signed. Sheldon read the petitioner's written statement into the record and it was admitted into evidence as a full exhibit. The written statement also indicated that the petitioner had killed the victim in retaliation. Finally, and notably, the petitioner's statement contained no mention that the victim had a gun, that the victim pointed a gun at the petitioner, or that he was in fear for his life or safety when he shot the victim. It is apparent that the petitioner's confession was powerful evidence that directly and unambiguously contradicted his claim of self-defense.

In addition to the evidence adduced by the state that the petitioner shot the victim in the back and confessed to shooting the victim in retaliation for his friend's murder, several witnesses who were at Papa's Pizza on the night of the shooting testified that they never saw the victim with a gun, and no gun was found on the victim. Furthermore, the surveillance video of the shooting revealed that the petitioner fired the first shot and had the opportunity to retreat but, instead, moved closer to the victim and continued to shoot him repeatedly while he lay on the ground. Finally, the state introduced consciousness of guilt evidence based on the petitioner's decision to flee from the scene of the shooting and his attempt, leading up to trial, to convince a fellow inmate, Perry, to testify, falsely, that he had seen the victim with a gun.

It is apparent that the state's case against the petitioner was extremely strong, and, as a result, any prejudice flowing from Pickering's alleged improper failure to challenge the admissibility of the autopsy report and Carver's testimony about it falls well short of undermining our confidence in the outcome of the trial. See *Coccomo* v. *Commissioner of Correction*, 203 Conn. App. 704, 727, 252 A.3d 383 ("[T]he strength of the state's case is a

significant factor in determining whether [any deficient performance] caused prejudice to the petitioner. The stronger the case, the less probable it is that a particular error caused actual prejudice." (Internal quotation marks omitted.)) cert. denied, 336 Conn. 943, 249 A.3d 737 (2021). Thus, we conclude that the petitioner has failed to demonstrate either that Pickering provided ineffective assistance in his representation of the petitioner at his criminal trial or that McIntyre provided ineffective assistance in his representation of the petitioner in his first habeas action.

B

The petitioner also asserts that the habeas court improperly rejected his claim of ineffective assistance with respect to McIntyre's failure to raise a claim in the first habeas action regarding sentence review.[29] Specifically, the petitioner contends that McIntyre performed deficiently by failing to allege that Pickering rendered ineffective assistance by failing to advise him with respect to the availability of sentence review and by failing to pursue such review on his behalf. The petitioner's claim lacks merit.

"Under article first, §8, of the Connecticut constitution and the sixth and fourteenth amendments to the United States constitution, the petitioner had a right to the effective assistance of counsel with respect to access to sentence review. [T]he sentencing process is a critical stage of a criminal trial. . . . Accordingly, an indigent criminal defendant has a constitutional right to appointed counsel at sentence review. . . . The right to counsel at sentence review would be meaningless unless it also implied the right to effective assistance of such counsel. . . . It would equally be meaningless if it were not afforded at the time when invocation of sentence

[29]See General Statutes § 51-194 et seq. (establishing sentence review division and procedure for obtaining sentence review); see also *State v. Nardini*, 187 Conn. 109, 120–22, 445 A.2d 304 (1982) (discussing statutory scheme establishing sentence review).

review is at issue." (Citations omitted; internal quotation marks omitted.) *James L.* v. *Commissioner of Correction*, 245 Conn. 132, 144, 712 A.2d 947 (1998); see also *Consiglio* v. *Warden*, 153 Conn. 673, 677 n.1, 220 A.2d 269 (1966) ("[t]he entire sentence review procedure is sufficiently a part of the original trial so that [an indigent criminal defendant is entitled to] representation in sentence review proceedings, including any resentencing made necessary by the action of the review division"). Furthermore, under Practice Book § 43-23, "[i]t is the responsibility of the counsel of record at the time of sentencing to represent the defendant at the hearing before the sentence review division of the Superior Court, unless, for exceptional reasons, such counsel is excused by the division."[30]

In the present case, it is undisputed that Pickering did not file a sentence review application on the petitioner's behalf and the petitioner never had his sentence reviewed by the sentence review division. At the habeas trial, Pickering testified that he had not been retained by the petitioner to represent him for the sentence review process. Pickering further testified that it was his practice to have a discussion with his clients when they received a packet of paperwork from the court, after sentencing, providing them with notice of the right to appeal and the right to sentence review.[31] He typically would tell his clients to read through the papers and make them aware of the deadlines contained therein, including the deadline to file an application for sentence review. In addition, he would have explained to the petitioner that he had the option to retain him or other counsel for any posttrial matters.

[30]We note that, under General Statutes § 51-195, in the discretion of the sentence review division, a defendant who seeks sentence review may receive a greater or lesser sentence than was imposed after trial.

[31]With respect to sentence review, General Statutes § 51-195 provides in relevant part that written notice of the right to sentence review shall be given by the clerk of the court to any defendant who, like the petitioner, has been convicted after a trial and has been sentenced to confinement for three years or more.

The petitioner testified that, although he subsequently became aware of the sentence review process, he was not informed about that process by Pickering in 2008. In addition, the petitioner testified that, if Pickering had discussed the sentence review process with him, he would have wanted to pursue such review. The petitioner further testified that he never discussed sentence review with McIntyre.

McIntyre testified that he could not recall whether Pickering had filed an application for sentence review on the petitioner's behalf. McIntyre also could not recall any discussion with the petitioner about the issue of sentence review, and Pickering's failure to apply for sentence review on the petitioner's behalf was not an issue raised in the first habeas action.

The habeas court concluded that, even assuming that Pickering had rendered ineffective assistance by "failing to perfect the petitioner's right to sentence review," the petitioner failed to establish that McIntyre performed deficiently by not raising that as an issue in the first habeas action. The court explained in relevant part: "This claim does not require much discussion. During direct examination, the petitioner admitted that he never discussed this sentence review claim with Attorney McIntyre . . . . So, although trial counsel did have a responsibility to [file] an application for sentence review *if* the petitioner had requested it, there would have been no way for Attorney McIntyre to have known about the petitioner's claim that he did not understand the right to apply for sentence review or that Attorney Pickering failed to honor his request to file the application without the petitioner telling him. . . . Therefore, even if the court assumed for purposes of argument that Attorney Pickering was ineffective for failing to perfect the petitioner's right to sentence review, Attorney McIntyre could not be found to have performed deficiently for failing to pursue a claim he was unaware of and could only have known about from the petitioner. . . . Therefore, since the petitioner cannot meet his burden of establishing the two *Strickland* factors against both trial counsel *and* Attorney McIntyre, this claim fails." (Citations omitted; emphasis in original; footnote omitted.)

We agree with the habeas court that the petitioner failed to demonstrate that McIntyre performed deficiently by failing to raise a claim of ineffective assistance against Pickering with respect to the issue of sentence review. The evidence presented at the habeas trial establishes that, although the petitioner became aware of the sentence review process at some point after his criminal trial in 2008,[32] he did not raise sentence review as an issue with McIntyre or otherwise indicate that he would have wanted to pursue sentence review had he known about it. The petitioner's testimony reflects, instead, that he and McIntyre did not discuss the issue of sentence review. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. . . . [I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Strickland* v. *Washington*, supra, 466 U.S. 691; see also, e.g., *Angel C.* v. *Commissioner of Correction*, 226 Conn. App. 837, 854–55, 319 A.3d 168 (trial counsel did not render deficient performance for alleged failure to investigate certain witnesses where petitioner did not bring such witnesses to counsel's attention), cert. denied, 350 Conn. 908, 323 A.3d 1091 (2024).

The petitioner suggests that McIntyre could have discovered that Pickering rendered deficient performance with respect to the petitioner's right to sentence review "simply by reviewing the record." On the contrary, a review of the record would have revealed only that a sentence review application had not been filed on the petitioner's behalf and would have shed no light on the reason *why* the application was not filed. Accordingly, there was nothing in the record to alert McIntyre to the fact that the petitioner would have wanted to apply

---

[32] The record does not reveal precisely when the petitioner became aware of the sentence review process. However, the petitioner did not testify that he remained unaware of sentence review by the time of his first habeas action.

for sentence review or that any decision already made by the petitioner not to make such an application was anything but an informed one. See, e.g., *Eastwood* v. *Commissioner of Correction*, 114 Conn. App. 471, 483, 969 A.2d 860 (petitioner decided not to seek sentence review upon advice from counsel about possibility that he could receive increased sentence), cert. denied, 292 Conn. 918, 973 A.2d 1275 (2009); *Valentin* v. *Commissioner of Correction*, 94 Conn. App. 751, 758, 895 A.2d 242 (2006) (petitioner voluntarily decided to forgo applying for sentence review upon counsel's advice that risk of increased sentence outweighed possible benefit). Thus, even assuming that Pickering rendered ineffective assistance by failing to represent the petitioner with respect to sentence review, the petitioner failed to demonstrate that McIntyre performed deficiently by not raising a claim of ineffective assistance against Pickering predicated on Pickering's failure to seek sentence review for the petitioner.

The judgment is affirmed.

In this opinion the other judges concurred.